# JOHN C. DONNELLY, Appellant, v. MISSOURI-LINCOLN TRUST COMPANY, Appellant.

### Division Two, February 6, 1912.

1. **REFERENCE: No Complaint of Rulings on Exceptions: Waiver.** Unless the motion for a new trial complains of the court's rulings on the exceptions to the referee's report, any objection to those rulings is waived, and cannot be considered on appeal. A complaint in the motion of the finding of the referee, and of the decree, is not enough.

2. **DECREE: Inconsistent: Rescission of Contract and Claim Thereunder: Purchase of Bonds.** A plaintiff cannot both repudiate a contract and claim under that contract. He cannot repudiate a subscription contract for the purchase of bonds and have a lien on the properties which secure the payment of those bonds for money paid by him for bonds that were never delivered. A decree rescinding the contract and granting him a pro rata lien on the properties covered by the bond mortgage is inconsistent.

3. **————: Power of Pledgor to Sell Bonds: Decree for Purchaser Against Trustee.** By the terms of a contract a trust company was to advance a large sum of money to a Baryta Company to purchase 33,000 acres of mineral lands and other properties, which were to be conveyed to the Trust Company as security for moneys advanced, and that was done. The Baryta Company was also authorized to issue bonds, with the Trust Company as trustee, secured by a first mortgage on the properties, and the Trust Company was to hold them as security for money advanced by it, but the Baryta Company was authorized to sell the bonds, but all proceeds derived therefrom were to be "applied to the payment of said loan and interest thereon." Thereafter the promoter of the Baryta Company entered into a written subscription contract with plaintiff by which plaintiff agreed to buy $30,000 of said bonds, "payments to be made to said Trust Company." The Baryta Company received the $30,000 from plaintiff, and did not turn it over to the Trust Company, which knew nothing of the subscription contract and never authorized it. The bonds were never issued. *Held*, that there is no basis for a personal judgment against the Trust Company, and it is not compelled to share with plaintiff in the proceeds of the sale of the properties covered by the mortgage, but plaintiff has a lien on those properties subject to the lien of the Trust Company.

4. ——: ——: ——: **Failure to Read Contract.** The fact that plaintiff did not read the clause in the contract declaring that the money paid by him for the bonds was to be paid to the Trust Company (trustee) instead of the company issuing them does not authorize the court to disregard that provision in the contract. Having had an opportunity to read it and having signed it, knowledge of that provision in the contract is by the law imputed to him. Nor does the fact that he had implicit confidence in the promoter of the company issuing the bonds, and had had for years, and that said promoter pretended to read said contract to him before he signed it, omitting to read that provision, give him any right to a judgment against the Trust Company or a lien on the properties conveyed to it as security for the payment of moneys advanced by it, for moneys he paid to said promoter, since said promoter did not represent the trustee, was not acting for it, and could not waive any right it had.

Appeal from St. Louis City Circuit Court.—*Hon. George H. Shields,* Judge.

REVERSED AND REMANDED *(with directions).*

*Willis Baldwin, E. O. Grosvenor* and *Eliot, Chaplin, Blayney & Bedal* for plaintiff appellant.

(1) The contract of June 15 was fraudulent as to prospective purchasers. This contract contemplated turning over property to the corporation by the promoters, at a sum of two or three times its actual cost, without disclosing its real cost to the purchasers of bonds and stock. Cook on Corp. (4 Ed.), sec. 651; Line Co. v. Case, 104 Mo. 572; Melendy v. Keen, 89 Ill. 395; Zang v. Adams, 23 Col. 408; Tyler v. Savage, 143 U. S. 79; Vreeland v. Stove Co., 29 N. J. Eq. 195; Ramsey v. Manufacturing Co., 116 Mo 330; Hornblower v. Crandall, 78 Mo. 581. (2) The Baryta Company was the agent of the Trust Company in selling plaintiff his bonds; and the Trust Company is personally liable for the false statements of its agents. Cook on Corp. (5 Ed.), sec. 143; Phipps v. Commission Co., 105 Mo. App. 67; Railroad v. Mathews, 77 Ala. 365; Dunn v. White, 63 Mo. 185; Clinker-

baum v. Weatherman, 157 Mo. 112. (3) Plaintiff's subscription contract constituted an equitable mortgage in his favor. Both the contracts of June 15, between Robinson and the Trust Company, and the subscription contract of June 17, were contracts to give a mortgage in the future to secure present payments. An agreement to give a mortgage in the future is given effect in a court of equity as an equitable mortgage. Canal Co. v. Vallette, 21 Howe, 422; Elevator Co. v. Meader, 72 Fed. 115; Howard v. Delgardo & Co., 121 Fed. 26; Hackett v. Watts, 138 Mo. 592; Carter v. Holman, 60 Mo. 498; Blackburn v. Tweedie, 60 Mo. 505; Martin v. Nixon, 92 Mo. 26; Sprague v. Cochrane, 114 N. Y. 104; Walker v. Brown, 165 U. S. 606; Carter v. Hollman, 60 Mo. 498; McQuie v. Peap, 58 Mo. 58. (4) The Trust Company is not entitled to participate in the equitable mortgage for two reasons: 1. Because it should be held personally liable, as pointed out in point two; 2. Because it has voluntarily released any rights it may have had in an equitable mortgage by taking a different mortgage than the one contracted to be given. Coyle v. Dairs, 20 Wis. 564; Campbell v. Carter, 14 Ill. 289; Dingman v. Randall, 13 Cal. 512.

*Carter, Collins, Jones & Barker* and *M. P. Murray* for defendant appellant.

(1) A decree or judgment in a cause must be within the scope of the pleadings and the issues raised by them. Tanner v. Railroad, 180 Mo. 26; Waldheier v. Railroad, 71 Mo. 516; Spoors v. Coen, 44 Oh. St. 497; Phillips, Code Pleading, sec. 466; Munday v. Vail, 34 N. J. L. 418; Smith v. Fordyce, 190 Mo. 16. (2) An action to foreclose a mortgage, or whereby the title to real estate is sought to be affected must be brought in the county within which such real estate or some

part thereof is situate. R. S. 1909, secs. 1753, 2809; Ensworth v. Holly, 33 Mo. 370; Truesdale v. Brennan, 153 Mo. 600. (3) Equity will affix an equitable mortgage only on property at the time owned by the contractor or thereafter acquired by him, and it is enforcible only against the owner and his heirs and representatives and purchasers or encumbrancers with notice. 19 Am. & Eng. Ency. Law, p. 15; 25 Cyc., p. 665. (4) A written contract is the highest evidence of the terms of an agreement between the parties and one who signs such is bound by its provisions although he failed to read it or inform himself of its provisions. 9 Cyc., p. 388; Gwin v. Wagner, 93 Mo. 327; McNealy v. Baldridge, 106 Mo. App. 18; Paris & Co. v. Carle, 116 Mo. App. 581; International Text Book Co. v. Lewis, 130 Mo. App. 158. (5) The adoption of one of two or more inconsistent remedies amounts to an election and is conclusive and a bar to the resort to an alternative remedy. 7 Ency. Pl., p. 364; Com. Co. v. Railroad, 52 Mo. App. 408; Frowein v. Heysler, 87 Mo. App. 315.

FERRISS, J.—Cross appeals. In 1901 several promoters, represented by one O. E. Robinson in the transactions hereinafter detailed, formulated a plan to organize a corporation to acquire and operate properties described in the contract set out below, on all of which properties Robinson claimed to hold options. The mineral lands had been examined by experts, who reported favorably and endorsed a prospectus issued by the promoters which showed the properties to have sufficient actual and potential value to justify the enterprise and the proposed capitalization of the company. Mr. Robinson interested the Missouri Trust Company (whose name was subsequently changed to Missouri-Lincoln Trust Company, and which will be spoken of herein as the Trust Company) to advance money by way of loan to acquire the properties for the

corporation to be created, and also to act as trustee in a mortgage to be given to secure a proposed bond issue. On June 15, 1901, a written agreement was entered into between the Trust Company and Robinson, as follows:

Memoranda of agreement between Orlando E. Robinson, of Baltimore, Maryland, and the Missouri Trust Company of St. Louis, Missouri,

Witnesseth: The said Robinson owns and has contracts to purchase approximately thirty-three thousand (33,000) acres of land in Washington county, Missouri, consisting of the Baryta, Lead, Zink, Iron and Timber lands known as the "McArthur," "Shibboleth," "White" and "Old Mines," and other properties, including stores, smelters, residences, town lots and buildings in and near Potosi, Cadet, Mineral Point and Old Mines, Missouri. Said Robinson also holds a contract to purchase a manufacturing plant at St. Louis, Missouri, the Gilman property, at Kansas City, Kansas, consisting of a brick building containing a complete Baryta grinding and pulverizing plant and six town lots; one thousand acres of Baryta land, in Miller county, Missouri; all the property and assets of the National Mining and Milling Company, of Baltimore, Maryland, and a branch manufactory at Highlands, New York; Baryta lands in North and South Carolina, including also all the patents and applications for patents which said National Mining and Milling Company is now using in the production of a pigment for paint manufacturers and by-products. Titles to all of said property to be made satisfactory to said Missouri Trust Company of St. Louis.

Said Trust Company has agreed to loan said Robinson several sums of money in the aggregate, if desired by said Robinson, but not to exceed the sum of $500,000, for the purpose of purchasing said properties as preliminary to the acquisition of said properties by the American Lead & Baryta Company, a corporation hereafter to be formed.

Said moneys are to be advanced from time to time as needed, not, however, more rapidly or in greater amounts than as follows:

One hundred thousand dollars at the date of this memorandum;

.................Dollars on or about..................1901.
.................Dollars on or about..................1901.
.................Dollars on or about..................1901.

Each amount to bear interest from the date of advancement at the rate of five per cent per annum.

Said O. E. Robinson to give his promissory notes for all sums advanced, each note to be accompanied by collateral security satisfactory to the Trust Company to at least the face value of the note.

All the said properties are to be conveyed to the said Missouri Trust Company of St. Louis as additional security, and are to be hereafter conveyed by the said Missouri Trust Company to the said American Lead & Baryta Company, or to some one for it.

Bonds of the said American Lead & Baryta Company, to the amount of the par value thereof of one million, five hundred thousand dollars, secured by a first mortgage upon the above properties and such other properties as said company may acquire before the execution of such mortgage, and to be a first lien thereon, are to be issued.

The capital stock of said Company to be ten million dollars. The Missouri Trust Company of St. Louis to be the trustee in the mortgage securing said bonds.

Of said bonds, one million, two hundred and fifty thousand dollars, and an equal amount of said stock, are to be delivered to the said Missouri Trust Company of St. Louis in lieu of said properties, and simultaneously therewith said properties are to be conveyed to the said American Lead & Baryta Company.

Bonds to the amount of two hundred and fifty thousand dollars to be reserved by the said Robinson to be used as part of the consideration to be paid Robinson to be used as part of the consideration to be paid in the purchase of certain of the properties above mentioned; but said bonds to be held by said Missouri Trust Company of St. Louis, until paid out by it for such purpose and are during the continuance of this loan not to be used for any other purpose, and unless and until needed for such purpose to be held by said Trust Company as additional security in the same manner as the remainder of said bonds are held. Said bonds and stock shall be held by the said Missouri Trust Company as additional security for the payment of said loans in the same manner as said properties were held until said loans are paid. Said bonds may be sold by said American Lead & Baryta Company from time to time for not less than par, but all proceeds derived therefrom shall be applied to the payment of said loan and interest thereon and proper fees and charges.

After the payment of said loans and interest, the balance of said bonds and stock, less the commission and charges to be paid said Trust Company, are to be delivered by the said Trust Company to said Robinson.

The incorporation and organization of said Company and the transfer of said properties to it and the preparation of said bonds and mortgage, and all steps and proceedings connected therewith or leading up thereto, to be done and taken

under the advice and subject to the approval of counsel to be selected by the said Missouri Trust Company of St. Louis, but all fees therefor to be paid by said Robinson or said American Lead & Baryta Company.

In Witness Whereof, this memorandum is executed by the said parties this 15th day of June, 1901.

ORLANDO E. ROBINSON,<br>
Missouri Trust Company, of St. Louis,<br>
By J. W. VANCLEAVE,<br>
Vice-President.

In this matter Robinson, as stated above, acted for the proposed corporation. It may be stated here that in all transactions mentioned herein Robinson, although acting in form individually, was in reality acting as representative of the corporation and associates, and with their authority and approval.

On August 1, 1901, the promoters organized, under the laws of Delaware, the American Lead and Baryta Company (hereinafter spoken of as the Baryta Company) with a capital stock of $10,000,000. On that day the stockholders of the Baryta Company resolved to take over the properties upon which Robinson and his associates held options, placing a value on them of $10,000,000; to issue to Robinson therefor $10,000,000 in capital stock; to assume Robinson's obligations to the Trust Company under the aforesaid contract of June 15th, and also to issue $1,500,000 of bonds secured by mortgage on all its said properties. Subsequently, on August 25th, 1901, the Trust Company agreed in writing with the Baryta Company and Robinson to transfer the properties purchased by the Baryta Company from Robinson to the Baryta Company, in consideration of the issue to Robinson of the $10,000,000 capital stock, as provided in the said resolution of the stockholders of the Baryta Company; this agreement, however, to be subject to the rights and lien of the Trust Company in such properties given by the foregoing contract of June 15th.

It resulted from the foregoing contracts that the Trust Company was under obligation to advance for the Baryta Company $500,000 to be used in purchasing properties for the company; the Trust Company to take the titles to the properties and hold same as security for its advances until the bonds and mortgage should be substituted therefor, at which time the properties should be deeded to the Baryta Company, and the bonds secured by mortgage to be thereafter held by the Trust Company as security. Pursuant to the foregoing, the Trust Company advanced from time to time, from June 15, 1901, to October 1, 1904, cash in varying amounts which aggregated, with interest, about $642,000. These advances were made prior to March, 1903, excepting three items aggregating about $140,000 advanced after March, 1903, to pay off underlying liens on properties purchased. The significance of these dates will appear later on. Shortly after the contract of June 15, 1901, set out above, Robinson had an interview in Philadelphia with the plaintiff, Donnelly, and procured his signature to the following subscription agreement:

St. Louis, Mo., June 17, 1901.
This contract by and between John Morton and O. E. Robinson, parties of the first part, and sundry persons, firms or corporations, whose names are hereunto subscribed, parties of the second part,

Witnesseth: Said first parties own or have contracts to purchase approximately 33,000 acres of land in Washington county, Missouri. [Here follows a description of the properties mentioned in the aforesaid contract of June 15th; and the contract then proceeds:]

The aforesaid properties are at present earning one hundred and sixty thousand dollars per annum.

Said first parties propose and agree to organize a corporation under the laws of Delaware, to be styled "The American Lead and Baryta Company," hereinafter called the "Baryta Company," with a capital stock of ten million dollars, which said capital stock shall be represented by the buildings and contracts of the first parties, as above set forth.

Said first parties further propose and agree to cause said "Baryta Company" to issue first mortgage five per cent ten-twenties gold bonds, aggregating one and one-half million dollars, secured by a first deed of trust on all the assets of said company. The trustee to be the Missouri Trust Company of St. Louis, Missouri.

Said bonds, or the proceeds of sale of same, to be used as follows:

| | |
|---|---|
| To pay balance due on properties, besides stock....$ | 750,000.00 |
| To cancel National Mining and Milling Company bonds .......... .......................... | 100,000.00 |
| For treasury of "Baryta Company," cash.......... | 250,000.00 |
| For treasury of "Baryta Company," bonds........ | 400,000.00 |
| Total .......... .......................... | $1,500,000.00 |

There is also to be placed in the treasury of said Baryta Company one million dollars of the stock of said Company.

Said treasury stock and bonds may be sold if, as when the directors may determine and at such prices as they may fix, but under no circumstances shall either stock or bonds be sold at less than par, and treasury bonds shall be sold only for such purposes as shall add to the value equal to the amount of bonds sold.

TREASURY.

| | |
|---|---|
| Cash .....:..........$ | 250,000.00 |
| Bonds .............. | 400,000.00 |
| Stock .............. | 1,000,000.00 |
| | $1,650,000.00 |

Said second parties hereby subscribe for and agree to purchase at par the amount of said bonds set opposite their respective names, upon the condition that they, the second parties, shall receive a bonus of stock of said "Baryta Company" of the par value of the amount of bonds subscribed for by them. Payments to be made by the said second parties to said Trust Company as and when called for by them, said second parties agreeing to accept from said Trust Company interim receipts for said bonds and stock until the same shall be ready for delivery by said Trust Company.

All stock to be pooled subject to terms to be agreed upon.

The original hereof shall be signed by said first parties, and counterparts may be subscribed by said second parties, but all together shall be taken and deemed one orginal instrument.

J. C. Donnelly, $25,000.00.

Donnelly was induced by Robinson to subscribe for the stock by means of Robinson's representations,

which in some material respects were false. Donnelly and Robinson were business friends. The former had implicit confidence in Robinson; so much so that he signed the subscription paper without reading it. Robinson took the paper from his pocket, read it partially to Donnelly, and after it was signed replaced it in his pocket, giving no copy at that time to Donnelly. He did not read the clause providing for payment to the Trust Company. Donnelly paid Robinson in September following $30,000, having increased the amount subscribed by $5,000, and subsequently received Robinson's personal receipt therefor. Not satisfied with this, he demanded and received receipts from the Baryta Company, dated February 28, 1902, for the $30,000. He also received the agreed bonus of 300 shares of the capital stock of the Baryta Company from Robinson. From time to time thereafter Donnelly demanded the bonds, but was put off by various excuses by Robinson. On March 30, 1903, W. C. Gross, attorney for Donnelly, wrote the following letter to the Trust Company:

Philadelphia, March 30, 1903.

President Missouri Trust Co.,
  St. Louis, Mo.
Dear Sir:—

  In the month of September, 1901, my client J. C. Donnelly, of this city, purchased from the American Lead & Baryta Company, offices 205-9 Wainwright Bldg., your city, $25,000 of the bonds of said Company, which he subsequently increased to $30,000, and for which he was to receive your Company's receipt as trustee for the said American Lead & Baryta Co.

  My client is anxious to know why he has not yet received your receipt or the bonds? Will you kindly let me hear from you at your earliest opportunity, and oblige,

Yours truly,
W. C. GROSS.

The Trust Company made this reply:

St. Louis, Mo., April 4, 1903.

Mr. W. C. Gross,
    Sibley Building, Philadelphia, Pa.
Dear Sir:—

In reply to your favor respecting the purchase by you from the American Lead & Baryta Company of this city of $25,000 of bonds of said Company, which you subsequently increased to $30,000, we have to advise that the bonds of said company have not yet been issued, and so have not been received by this Company.

My present advice is that they will be ready in a few weeks.                        Very truly yours,

AUG. SCHLAVY,
President.

The receipt of this letter from Gross was the first intimation to the Trust Company of the purchase by Donnelly. At that time, as stated above, the Trust Company had advanced to the Baryta Company the money for the purchase of the properties, excepting the amounts paid to remove underlying liens. The $30,000 paid by Donnelly was used for the benefit of the Baryta Company. No part of it was paid to the Trust Company.

In November, 1903, Donnelly visited St. Louis, and, after investigation, filed this suit against the Baryta Company, Robinson, Morton (one of the original promoters), and the Trust Company. In the meantime, the properties as they were purchased were conveyed to the Trust Company. The bonds provided for in the contract of June 15, 1901, were never issued. In September, 1904, the Baryta Company was reorganized, its capital stock reduced to $3,500,000, and an issue of bonds to the extent of $900,000 authorized by its stockholders. On October 1, 1904, the properties held by the Trust Company were conveyed to the Baryta Company, and on the same day a first mortgage on all the properties was executed by the Baryta Company to secure an issue of $640,000 bonds, and

such bonds and mortgage delivered to the Trust Company as security for the moneys theretofore advanced by the Trust Company. This indebtedness to the Trust Company was subsequently, in March, 1905, put into the shape of notes made by the Baryta Company. The Trust Company now holds these notes, and as security for same holds the bonds and mortgage. Some payments were subsequently applied on this indebtedness.

The referee finds that there is due the Trust Company from the Baryta Company $580,008.09, with interest at 6 per cent from April 5, 1905. The enterprise proved to be a failure. There are many other facts developed in the evidence and covered by the finding of the referee, but which, in the view we take of the case, are not material to the conclusions reached.

The foregoing statement is adopted, in the main, from the findings of the referee.

The amended petition on which the case was tried alleges a conspiracy between the defendants Robinson and Morton to organize a sham corporation for the purpose of fraud on purchasers of bonds; that the defendants (whether the Trust Company is included in this term it is hard to determine) by false representations, detailed at length in the petition, induced the plaintiff to subscribe $30,000 of bonds of a proposed issue of $1,500,000; that the written contract referred to in the above statement of facts were fraudulent; that Robinson was the authorized agent of all the defendants to sell the bonds and collect therefor; that the conveyance by the Trust Company to the Baryta Company was fraudulent; that the bond issues of October, 1904, and transfer thereof to the Trust Company, were in fraud of plaintiff's rights; that plaintiff was beguiled and delayed in asserting his rights by the false promises and excuses of defendants; that false statements were made by the officers of the Baryta Company in getting a license to do business in Mis-

souri; that the $30,000 paid by the plaintiff was used
by the company in paying interest and taxes and in
purchasing the properties of the company; that the
conveyance to the Trust Company of the properties
was as security for advances; that these properties
are worth in excess of the debt to the Trust Company;
that the defendants (evidently defendants other than
the Trust Company) have a large equity in these prop-
erties; that Morton and Robinson are insolvent; that
Robinson is a non-resident; that plaintiff has received
no consideration for his $30,000; that the stock deliv-
ered to him is worthless, and that the bonds pur-
chased by him have never been issued. Plaintiff al-
leges that he has elected to rescind the contract for
the purchase of the bonds, demands repayment of his
money and tenders in open court to said defendants
the certificates of stock in the Baryta Company which
had been delivered to him. He further alleges that
the Trust Company is indebted to Robinson and Mor-
ton in the sum of $50,000.

The petition prays, first, that the subscription
agreement under which plaintiff purchased the bonds
be declared fraudulent and void; second, that the con-
veyances of the properties to the Trust Company be
declared mortgages for the security of the valid obli-
gations owing by defendants to the Trust Company,
and that the court ascertain the amount of such in-
debtedness; third, that Robinson and Morton be en-
joined from conveying or mortgaging any interest
they may have in the properties conveyed to the Trust
Company, or their equity therein; fourth, that the
Trust Company be enjoined from conveying any of
said properties; fifth, that upon final hearing, a de-
cree be entered for plaintiff against defendants Robin-
son and Morton for $30,000 and interest, and that
same be declared a lien upon all the right, title and
interest of said defendants next in right and claim to

the Trust Company, if it should be found that the Trust Company has a valid claim, otherwise to be declared a lien in advance of the claim of the Trust Company; sixth, that any conveyances of properties by the Trust Company to the Baryta Company be declared void as against plaintiff; seventh, that the judgment against Robinson and Morton be declared a lien upon any amount that may be found owing by the Trust Company to defendants Robinson and Morton; eighth, for other and further relief.

The petition is lengthy, and contains a great deal of redundant matter. The use of the expression "defendants" is obscure and confusing. It is difficult to tell when it includes the Trust Company, and whether it is intended to charge the Trust Company as a party to the fraud. This much is clear: The plaintiff charges that his contract to purchase bonds was fraudulent on the part of defendants; that he rescinds and repudiates it, and demands a judgment for his money against Robinson and Morton; his theory being that the Baryta Company was a sham, and that the two individuals mentioned were the real parties with whom he dealt, and he seeks to fasten a personal judgment against them as a lien upon their interest in the lands, subject to the valid claims of the Trust Company, and a lien upon any money owing them by the Trust Company.

The cause, with the consent of the parties, was referred to Mr. James C. Jones to try all the issues. A large volume of evidence was introduced. The report of the referee is voluminous, and finds the facts in detail. His findings of fact are in the main accepted as accurate by the parties. They complain of his legal conclusions.

The referee finds as a matter of law, from the facts found, as appears from his opinion and recommendations to the court, that Donnelly was entitled

to rescind the contract of subscription, and recover the amount paid by him; that the contract of June 15, 1901, gave to the Baryta Company the right to sell the bonds; that the subscription contract created an equitable mortgage in favor of Donnelly on the properties held by the Trust Company, equal in dignity with that of the company, and that, consequently, Donnelly is entitled to share in this mortgage pro rata with the Trust Company. Judgment was recommended by the referee (1) against the defendants, exclusive of the Trust Company, for $30,000 and interest; (2) that if this judgment is not paid within a fixed period, the plaintiff and the Trust Company be decreed to have a joint first lien on the properties mentioned in lieu of the first mortgage given by the Baryta Company on October 1, 1904, and that a sale be had thereunder; (3) that the proceeds be divided between plaintiff and the Trust Company pro rata, according to the respective amounts of their claims and to the extent of such claims.

Exceptions were filed by both plaintiff and the Trust Company to the report of the referee, which were overruled, and judgment entered by the court in accordance with the above recommendations. Motions for new trial filed by both the above parties were overruled, and both appeal. No exceptions were filed by either of the defendants Robinson, Morton and the Baryta Company.

The motion for a new trial filed by plaintiff fails to complain of the ruling of the court upon the exceptions to the referee's report. The motion complains of the finding of the referee, and of the decree, but this is not enough. The purpose of the motion for new trial in this case is to call the attention of the court to its alleged erroneous ruling *on the exceptions,* so that the court may, if convinced of error, correct its rulings thereon. Failing, in the motion for new

trial, to call the attention of the court to its action upon the exceptions, the error, if any in the ruling of the court upon the exceptions, is waived. We have recently ruled upon this question in State ex rel. Wayne County v. Woods, 234 Mo. 16; Maplegreen Realty Co. v. Mississippi Valley Trust Co., 237 Mo. 365. It follows from the foregoing that the rulings of the trial court upon plaintiff's exceptions are not before us for review, and the judgment on plaintiff's appeal must be affirmed. Our rulings, however, on defendant's appeal practically dispose of the points sought to be made by plaintiff's appeal, with the same effect as if the motion for new trial were in proper form.

Addressing ourselves to defendant's appeal: The appellant Trust Company complains of the decree upon two grounds. First, that it is not supported by the pleadings; and, second, that it permits the plaintiff to share in the securities held by the Trust Company, such relief not being justified by either the pleadings or the proof.

The referee virtually conceded that his finding went beyond the prayer of the bill; but he based his ruling upon the proposition that the plaintiff in a bill in equity is entitled to any relief authorized by the facts pleaded and proven. This proposition, however, does not quite meet the objection of the appellant. The objection is that the decree permits the plaintiff to repudiate and rescind the subscription contract, and at the same time grants him relief upon the theory that he retains the interest acquired by the contract. Plaintiff rescinds the contract, and demands his money back from the man who deceived him into making the contract, on the theory that a fraudulent contract is no contract. The finding of the referee and the decree of the court are in his favor. They permit him to rescind, and give him a money judgment against the defendants other than the Trust Company; but the

239 Sup.—25

decree also gives him (what he does not ask for in his petition) a lien, equal in dignity to that of the Trust Company, upon the securities in the hands of the Trust Company. This could only be on the theory that he owns, by reason of his subscription contract, a portion of the debt covered by these securities. In other words, by demanding and obtaining a lien against these securities, on a par with the Trust Company, he necessarily affirms the subscription contract. Obviously, he cannot in the same breath both repudiate and claim under the same contract. The decree is therefore inconsistent in this regard. [Hector v. Mann, 225 Mo. 228; Nanson v. Jacob, 93 Mo. 331.]

Upon the merits of the case, there is nothing in the evidence to impugn the good faith and fair dealing of the Trust Company. There is no basis for a personal judgment against that company. No such judgment is recommended by the referee nor decreed by the court. The only substantial question presented is, whether the plaintiff, by his subscription contract, obtained a pro rata share in the equitable mortgage given to the Trust Company by the contract of June 15, 1901.

The able and exhaustive report filed by the referee finds that the said contract of June 15th authorized the Baryta Company, acting through Robinson, to contract with Donnelly for the sale of $30,000 of bonds, and to receive the purchase price, and that by such contract Donnelly acquired a right pro rata with the Trust Company in the equitable mortgage held by the Trust Company. This is the crucial question in the case so far as concerns the appeal. We think this conclusion of the referee was erroneous. The clause in the contract of June 15th on which it is based reads: "Said bonds may be sold by said American Lead and Baryta Company from time to time for not less than par, but all proceeds derived therefrom shall be ap-

plied to the payment of said loan and interest thereon, and proper fees and charges.'' This clause must be construed in the light of the circumstances under which it was made, in connection with the entire contract, and in the light of common practice. There is nothing in the contract which contemplates subscription contracts for these bonds. They are to be issued, and the entire issue is to be delivered to the Trust Company. The provision for sale to the Baryta Company refers to bonds, not subscription for bonds, and plainly contemplates what is a matter of common practice, namely, that the *bonds* to be held by the Trust Company as security may, after they have come into its possession, be taken down by the pledgor and sold, upon paying their proceeds to the Trust Company to be applied upon the debt, thus reducing the debt and the security pro rata. The pledgor needed no provision in the contract to enable him to sell the property pledged, subject to the pledge. This clause in the contract empowered him to demand from the Trust Company the bonds themselves, upon paying their proceeds to the company.

It is urged that the power given to the Baryta Company to sell is unrestricted, and that the Trust Company trusted the Baryta Company to turn in the proceeds. The contract cannot fairly be so construed; certainly not to the extent of permitting the Baryta Company to make subscription contracts and collect the agreed price in advance of the delivery of the bonds. Such a construction would enable the Baryta Company, if it saw fit, to convert the entire security to its own use. Evidently the parties did not so construe the contract. The subscription contract itself, which the Baryta Company undertook to make with Donnelly, contains this provision: ''Payments to be made by the said second parties [subscribers] to the said Trust Co. as and when called for by them, said second parties agreeing to accept from said Trust

Company interim receipts for said bonds and stock until the same shall be *ready for delivery by said Trust Company.*" Donnelly, negligently and without legal excuse, signed this subscription contract without reading it or having this clause read to him. Having the opportunity to read it, and failing to do so, he is to be treated as if he had read it. Knowledge of it is imputed to him by the law. Here was notice to him that the bonds were to be delivered by the Trust Company, and that the purchase price was to be paid to that company. Disregarding this provision, Donnelly paid his money to one who had no right, as Donnelly must be held to have known, to collect it, and to one who converted it to his own use. Donnelly acted in good faith, relying implicitly on his friend, Robinson, but he so acted at his peril. It is urged, further, that it mattered not that the money was paid to Robinson, and that if it had been paid to the Trust Company that company would have placed it to Robinson's credit, and he would have thus controlled it. This reasoning is obviously wrong. If this money had been paid to the Trust Company, it would have been necessarily credited to the debt owing by the Baryta Company, and thus all parties would have been protected.

But it is said the Trust Company was not a party to this trust agreement, and that the provision for payment to it was inserted by the Baryta Company, and could be waived by the party who created it. The Baryta Company could not waive the rights of the Trust Company after notifying Donnelly of such rights. The subscription contract plainly notified Donnelly that the Trust Company alone had the right to collect this money, and had control of and would deliver the bonds. No waiver by the Baryta Company could negative this notice. Nearly two years later, Donnelly, having learned of this provision for payment to the Trust Company, writes through his attor-

ney to the Trust Company and demands the interim receipts, thus recognizing, after the Trust Company had made its advances, the force of this provision, and seeking too late to avail himself of its protection.

Recognizing that it was his duty to read the contract, and that he is bound by its contents as if he had read it, plaintiff attempts to establish the proposition that Robinson was the authorized agent of the Trust Company to make this subscription contract, and that therefore the Trust Company is bound by everything Robinson did, even to the extent of the false representations. To support this proposition plaintiff relies solely upon the clause in the contract of June 15th, set out above, providing that the Baryta Company might sell the bonds. We have above ruled this proposition against the plaintiff, and nothing further need be said upon it. The Trust Company first knew of the subscription by Donnelly in March, 1903, when it received the Gross letter. At that time, under the agreement of June 15, 1901, it had advanced the money to buy the properties.

The proceedings subsequent to March, 1903, do not impair whatever rights Donnelly acquired by virtue of the subscription. The first lien of the Trust Company has never been surrendered or impaired. This appellant is not contesting the right of Donnelly to establish a lien next to that of the Trust Company. The changes made in 1904 in the stock and bond issues do not affect Donnelly's rights in this regard. Furthermore, as Donnelly now rescinds and repudiates the subscription contract, he is claiming no rights as a bondholder or subscriber for bonds, and, hence, is in no position to complain of changes in bond issues which do not affect his right to a lien next to that of the Trust Company. This ruling simply relegates plaintiff to the position taken by him in his petition, namely, claiming a right to a lien upon whatever interest Robinson, Morton or the Baryta Company has

in these properties, subject to the lien of the Trust Company.

The judgment is reversed and the cause remanded with directions to the circuit court to enter judgment for defendant Trust Company for costs, and to otherwise modify its decree in accordance with the views herein expressed. *Kennish, P. J.,* and *Brown, J.,* concur.